HUGHES HUBBARD & REED LLP
Lisa A. Cahill
Jason A. Masimore
John T. McGoey
Nkasi Okafor
Allison L. Bowles
One Battery Park Plaza
New York, New York 10004
(212) 837-6000
*Attorneys for Plaintiff Leroy Hayes*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



LEROY HAYES,

                            Plaintiff,

              -against-

CITY OF NEW YORK; MARTIN HORN;
CAROLYN THOMAS; WARDENS MICHAEL
HOURIHANE, WILLIAM THOMAS, ROBERT
SHAW AND FRANK SQUILLANTE;
ASSISTANT DEPUTY WARDEN JOHN
MURDOCH; CAPTAINS EDWIN CABAN,
NELSON AND SPEARS; OFFICERS ROBERT
ANTHONY, CHAPMAN, DAVIS, LYNCH,
RAVEN, JOSE RIVERA, RODRIGUEZ, JOHN
DOES 1 AND 2 AND JANE DOE; ESU
CAPTAIN DOES 1 AND 2; ESU OFFICERS
GATTO AND VALENTIN; AND ESU OFFICER
DOES 1-18,

                         Defendants.

Judge Hellerstein

**COMPLAINT**

Jury Trial Demanded

'07 CIV 9807

Plaintiff Leroy Hayes ("Plaintiff"), by his attorneys Hughes Hubbard & Reed LLP, for his Complaint, alleges as follows:

## NATURE OF ACTION

1.    Plaintiff brings this prisoner civil rights action for money damages to redress Defendants' repeated violations of his rights under the First, Eighth and Fourteenth Amendments to the United States Constitution and the laws of the State of New York.  Plaintiff sustained severe physical and emotional injuries when he was repeatedly harassed, assaulted and beaten by uniformed employees of the New York City Department of Correction ("DOC" or "Department") in November 2006, February 2007, March 2007 and May 2007, while Plaintiff was held in various DOC detention facilities on Rikers Island.  The Defendants include officers and captains assigned to jails operated by the Department who inflicted, ordered the infliction of, and/or failed to intervene to stop the infliction of harassment and assaults on Plaintiff; who retaliated against Plaintiff for exercising his First Amendment right to petition for the redress of the violation of his rights; who lied in written reports and coerced false statements to prevent Plaintiff's mistreatment from coming to light; and who failed properly to investigate Plaintiff's allegations of misconduct on the part of uniformed employees of the Department.  Defendants also include supervisors in these jails and in the Department who have implicitly authorized employee misconduct, have failed adequately to investigate repeated reports of excessive force by uniformed staff, have failed to supervise uniformed staff in the face of (1) repeated written communications from Plaintiff's counsel notifying them of systematic violations of Plaintiff's civil rights and asking that they take steps to protect Plaintiff from further wrongful acts by

uniformed DOC employees; and (2) upon information and belief, a demonstrated history of

inmate abuse in Department jails brought to light by numerous inmate complaints and civil

actions.

## JURISDICTION

2.     Plaintiff brings this action pursuant to the First, Eighth and Fourteenth

Amendments to the Constitution of the United States, 42 U.S.C. § 1983, and the laws of the State

of New York.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a), and

by 28 U.S.C. § 1367(a), which provides for supplemental jurisdiction over Plaintiff's state law

claims, which form part of the same case or controversy.

## VENUE

3.     Venue is proper in the United States District Court for the Southern

District of New York pursuant to 28 U.S.C. §§ 1391(b) and 112(b).

## JURY DEMAND

4.     Plaintiff demands trial by jury in this action.

## PARTIES

5.     Plaintiff is a citizen of the State of New York who resided, prior to his

June 27, 2006 arrest, at 51 East 129th Street, New York, New York.  At all times referred to in

this complaint, through to the present, Plaintiff has been an inmate in the custody of the DOC,

except that he was transferred to Nassau County Correctional Center ("NCCC") in late

2

November 2006 until early January 2007. From June 28, 2006 through August 11, 2006, Plaintiff was incarcerated at the Manhattan Detention Center. From August 11, 2006 through August 27, 2006, Plaintiff was incarcerated at the George Motchan Detention Center ("GMDC") at Rikers Island. From August 27, 2006 through November 20, 2006, Plaintiff was incarcerated at the George R. Vierno Center ("GRVC") at Rikers Island. From November 20, 2006 through late November 2006, Plaintiff was incarcerated at the Otis Bantum Correctional Center ("OBCC") at Rikers Island. In late November 2006, Plaintiff was transferred to the NCCC, where he remained through on or about January 3, 2007. On or about January 3, 2007, Plaintiff was returned to Rikers Island and was incarcerated at OBCC until March 20, 2007. From March 20, 2007 through August 14, 2007, Plaintiff was incarcerated at GRVC. From August 14, 2007 through August 29, 2007, Plaintiff was incarcerated at the North Infirmary Command ("NIC") on Rikers Island. From August 29, 2007 through to the present, Plaintiff has been incarcerated at GRVC.

6.    Defendant City of New York ("City") is a municipal corporation that, through its DOC, operates a number of detention facilities, including those on Rikers Island in the Bronx. The Department, through senior officials at its central office and in individual facilities, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff (including, but not limited to Department Directive 5006R-B, dated June 20, 2006 and signed by Defendants Carolyn Thomas and Martin Horn). In addition, upon information and belief, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails, including those that are

3

inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the Department, constitute unwritten Departmental policies or customs. The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein.

7.    Defendant Martin F. Horn has been the Commissioner of the DOC since January 1, 2003. At all times referred to in this complaint, he was the chief executive officer of the Department, responsible, consistent with the legal mandates governing the Department, for the management and control of all City jails and for all matters relating to the selection, supervision, promotion, training, and discipline of the uniformed staff, including the supervisory security staff, of the City jails. As Commissioner, Defendant Horn was and is also responsible for the care, custody, and control of all inmates housed in the Department's jails, including Plaintiff, as well as promulgating and implementing policies, including those with respect to the use, reporting and investigation of force by uniformed staff. Upon information and belief, as Commissioner, Horn was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails, including events alleged herein. Defendant Horn is sued in his individual and official capacities.

8.    Defendant Carolyn Thomas was the Chief of Department of DOC during the times referred to in this complaint. As Chief of Department, she was the highest ranking uniformed member of the Department and was responsible for the selection, supervision, oversight, and discipline of the uniformed security staff, including the supervisory security staff,

4

in all the Department jails. She was also responsible for the care, custody, and control of all inmates in the Department jails, including Plaintiff, as well as promulgating and implementing policies, including those with respect to the use, reporting and investigation of force by uniformed staff. Defendant Carolyn Thomas is sued in her individual and official capacities.

      9.     Defendant Frank Squillante was, from at least as early as November 1, 2006 and continuing during certain times referred to in this complaint, the Warden of GRVC, a Department-operated jail. Defendant Squillante was, at least as early as December 5, 2006, Assistant Chief of Special Operations. As Warden of GRVC, Defendant Squillante's responsibilities included supervision of correction officers, captains and other supervisors with respect to the care, custody and control of prisoners confined in the jail. These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the Department directives and orders governing the use of force and the reporting of use of force and the Board of Correction Minimum Standards. Upon information and belief, as the Warden, Defendant Squillante was provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail, including events alleged herein. As Assistant Chief of Special Operations, Defendant Squillante was responsible for monitoring and addressing all operational issues in Department jails pertaining to the safety and security of inmates and staff. These responsibilities included the tracking of violent incidents and the formulation of responses designed to protect the personal safety of Department staff and inmates in its custody. Upon information and belief, as Assistant Chief of Special Operations, Defendant Squillante was

5

provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails, including events alleged herein. Defendant Squillante is sued in his individual and official capacities.

10.    Defendant Robert Shaw was, during certain times referred to in this complaint, the Warden of GRVC, a Department-operated jail. As Warden of GRVC, Defendant Shaw's responsibilities included supervision of correction officers, captains and other supervisors with respect to the care, custody and control of prisoners confined in the jail. These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the Department directives and orders governing the use of force and the reporting of use of force and the Board of Correction Minimum Standards. Upon information and belief, as the Warden, Defendant Shaw was provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail, including events alleged herein. Defendant Shaw is sued in his individual and official capacities.

11.    Defendant William Thomas was, during certain times referred to in this complaint, the Warden of OBCC, a Department-operated jail that also contains the Central Punitive Segregation Unit ("OBCC-CPSU"). As Warden of OBCC, Defendant William Thomas's responsibilities included supervision of correction officers, captains and other supervisors with respect to the care, custody and control of prisoners confined in the jail. These responsibilities were and are required to be carried out in a manner consistent with the legal

mandates that govern the operation of DOC and its jails, including the Department directives and orders governing the use of force and the reporting of use of force and the Board of Correction Minimum Standards. Upon information and belief, as the Warden, Defendant William Thomas was provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail, including events alleged herein. Defendant William Thomas is sued in his individual and official capacities.

12.    Defendant Michael Hourihane was, at certain times referred to in this complaint, the Warden of OBCC, and at other times referred to in this complaint, the Warden of the Criminal Justice Bureau and Court Command Operations for the Department at Rikers Island ("CJB"). As Warden of OBCC, Defendant Hourihane's responsibilities included supervision of correction officers, captains and other supervisors with respect to the care, custody and control of prisoners confined in the jail. These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the Department directives and orders governing the use of force and the reporting of use of force and the Board of Correction Minimum Standards. Upon information and belief, as the Warden of OBCC, Defendant Hourihane was provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail, including events alleged herein. As Warden of CJB, Defendant Hourihane's responsibilities included supervision of correction officers, captains and other supervisors with respect to the Department directives and orders governing the use of force, the reporting of use of force, the investigation of reported and unreported uses of force, and the Board of Correction Minimum Standards. Defendant

7

Hourihane's responsibilities also included ensuring that inmates charged with infractions were provided due process concerning the adjudication of those infractions. These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including Department directives, the laws and Constitution of the State of New York and the United States Constitution. Upon information and belief, as the Warden of CJB, Defendant Hourihane was provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents at Rikers Island, including events alleged herein, as well as investigative reports of uses of force, the accuracy of which Defendant Hourihane was required to ensure, as he was required independently to assess and determine whether such uses of force were justified. Defendant Hourihane is sued in his individual and official capacities.

      13.    Defendant John Murdoch, shield number 82, was, at all times referred to in this complaint, an Assistant Deputy Warden. As an Assistant Deputy Warden, Defendant Murdoch's responsibilities included supervision of correction officers, captains and other supervisors with respect to the Department directives and orders governing the use of force, the reporting of use of force, the investigation of reported and unreported uses of force, and the Board of Correction Minimum Standards. Defendant Murdoch was responsible for ensuring that use of force investigation reports, including a specific report concerning a use of force on Plaintiff alleged herein, were accurate and making recommendations to the Warden of CJB concerning whether additional steps needed to be taken with respect to those uses of force. These responsibilities were and are required to be carried out in a manner consistent with the

8

legal mandates that govern the operation of DOC and its jails, including Department directives, the laws and Constitution of the State of New York and the United States Constitution. Defendant Murdoch is sued in his individual and official capacities.

14.     Defendants Edwin Caban, shield number 1259, Nelson, shield number 1241, Spears, shield number 347, and ESU Captain Does 1 and 2 were, at all times referred to in this complaint, captains employed by DOC and assigned to Department-operated jails or the Emergency Services Unit ("ESU"). These captains had direct, first-line supervisory responsibilities over the correction officers assigned to the jails and/or the ESU, including responsibility for taking appropriate measures to ensure and protect the personal safety of inmates assigned to their housing or program areas, or, in the case of ESU, inmates they were tasked with searching. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the Department and its jails, including the Department directives and orders governing the use of force and the reporting of use of force and the Board of Correction Minimum Standards. Each of these captains is sued in his or her individual and official capacities.

15.     Defendants Robert Anthony, shield number 12032, Chapman, shield number 15198, Davis, Gatto, shield number 12306, Lynch, shield number 8546, Raven, Jose Rivera, shield number 11157, Rodriguez, Valentin, shield number 13235, John Does 1 and 2, Jane Doe and ESU Officer Does 1-18 were, at all times referred to in this complaint, correction officers employed by DOC and assigned to Department-operated jails or the ESU. Correction

officers, under supervision, maintain security within correctional facilities and are responsible for the care, custody and control of inmates in the custody of DOC. These Defendants are sued in their individual and official capacities.

16.    At all times referred to in this complaint, each and every named Defendant was acting in the capacity of agent, servant, and employee of the Defendant City, within the scope of his or her employment as such, and acting under color of state law. Plaintiff does not know the names of the corrections personnel sued as Does and will amend this complaint to state the true names when they become known.

## FACTUAL ALLEGATIONS

**I.    Plaintiff Develops Incriminating Information Against Correction Officers Concerning Smuggling**

17.    In or around October 2006, while Plaintiff was incarcerated at GRVC, officers in the Investigation Unit approached Plaintiff and asked him to develop and provide information concerning the smuggling of contraband, including cigarettes and drugs, into GRVC by correction officers, because Plaintiff worked at least three jobs that put him in contact with high movement areas within GRVC.

18.    First, Plaintiff worked the night shift as an "SPA." As an SPA, Plaintiff was assigned to the so-called "11-building" at GRVC to keep suicide watch over inmates in their cells during the night shift from 10 p.m. to 6 a.m. Occasionally, Plaintiff worked additional

shifts. Second, Plaintiff took on odd jobs from guards, sweeping and cleaning up when asked to and other similar chores. Third, he occasionally worked in the barbershop.

19.     In the course of performing these jobs, Plaintiff uncovered at least three instances of improper smuggling by uniformed employees of the Department at GRVC.

A.     First Example of Smuggling

20.     Upon information and belief, it was common knowledge among inmates and uniformed DOC employees in late 2006 that, for $20 per pack, an inmate could purchase Newport cigarettes from certain uniformed DOC employees. For $10, an inmate could purchase a pouch of "Top" loose tobacco.

21.     One Friday, prior to November 5, 2006, while Plaintiff was working as an SPA in the 11-building at GRVC, "Inmate 1" gave Plaintiff a $100 bill and asked him to deliver it to "Inmate 2" so that Inmate 2 could purchase Newport cigarettes from Correction Officer Pinkett. Plaintiff complied, and Inmate 2, in turn, upon information and belief, gave Correction Officer Pinkett the money. Upon information and belief, when Correction Officer Pinkett took the money from Inmate 2, he told Inmate 2 that he did not have any Newports in his possession at that time, but that when Correction Officer Pinkett returned to his next shift on the following Monday, he would deliver them.

22.     That Monday, while Plaintiff was waiting in line for food in the 11-building at GRVC, Correction Officer Pinkett approached him and another inmate working as an

11

SPA and pulled them aside. Correction Officer Pinkett gave Plaintiff a plastic bag of Newports and instructed him to deliver them to Inmate 1, and gave the other SPA a pouch of Top tobacco and instructed him to give it to Inmate 2. To effectuate the delivery, Correction Officer Pinkett instructed Plaintiff to mop floors after lunch so that Plaintiff could use his mopping as an excuse to approach Inmate 1's cell. Correction Officer Pinkett also instructed Plaintiff to turn his back towards the prison video surveillance cameras when he delivered Correction Officer Pinkett's contraband to Inmate 1 to avoid detection.

      B.     <u>Second Example of Smuggling</u>

     23.     In the barbershop where he worked, Plaintiff learned that Correction Officer Petit sold Newport cigarettes, which she concealed underneath the trash bag in the trashcan. To effectuate her smuggling without being caught, upon information and belief, Correction Officer Petit instructed a Spanish-speaking inmate who worked in the barbershop to retrieve the cigarettes out of the trashcan distribute them to inmates who had bought them from Correction Officer Petit.

      C.     <u>Third Example of Smuggling</u>

     24.     Plaintiff learned that Correction Officer Plastic sold marijuana and cigarettes to inmates in GRVC. Correction Officer Plastic charged inmates $100 to sneak marijuana and cigarettes onto Rikers Island from outside sources. If an inmate wanting to purchase drugs or cigarettes did not have cash, Correction Officer Plastic would (for an extra

$100) arrange to pick up cash wired by a friend of the inmate or a member of the inmate's family

to Western Union and then deliver the drugs and cigarettes to the inmate in prison.

25.    Specifically, Plaintiff became aware that Correction Officer Plastic sold

marijuana to "Inmate 3" in the 11-building at GRVC.  Correction Officer Plastic asked Plaintiff

to help with the scheme but Plaintiff declined, not wanting to touch illegal drugs.

26.    Smuggling tobacco products to inmates violates Department Directive

3914, signed by Defendant Commissioner Horn.  Guards found to have smuggled cigarettes to

prisoners "shall be deemed as promoting prison contraband and may be subject to arrest,"

according to Section IV.D. of Department Directive 3914, prior to being superseded in April

2007 (now Section IV.E.).  Furthermore, such guards will be "subject to disciplinary action and

may be subject to termination," pursuant to Section V.D.

27.    Upon information and belief, as a result of their smuggling contraband,

between November 2006 and April 2007, Correction Officer Pinkett and Correction Officer

Plastic's employment with the DOC was terminated and Correction Officer Petit was transferred

to the Vernon C. Bain jail, also known as the "barge."

## II.    Defendants Captain Spears and Officer Raven Enlist the Emergency Services Unit to Retaliate Against Plaintiff for Developing Incriminating Information Against Correction Officers

28.    On or about Thursday, November 2, 2006, Plaintiff encountered

Defendants Captain Spears and Correction Officer Raven in a hallway at GRVC.  Correction

13

Officer Raven confronted Plaintiff and asked him whether he knew the names of correction officers involved in dealing contraband to inmates. Plaintiff replied that he did, but he declined to give the names to Defendants Captain Spears and Officer Raven because Plaintiff did not trust either of them with that information.

29.    Defendants Captain Spears and Correction Officer Raven became irate with Plaintiff after he told them he did not trust them and would not reveal the names to them. From that day forward, Defendants Captain Spears and Correction Officer Raven engaged in a calculated campaign of retaliation, harassment and abuse against Plaintiff, maliciously motivated and totally without penological justification.

30.    On the next day, on or about Friday, November 3, 2006, Defendants Captain Spears and Correction Officer Raven caused Plaintiff to be fired from his job at the barbershop.

A.    Emergency Services Unit Background

31.    Upon information and belief, on or about November 5, 2006, Defendant Captain Spears and Correction Officer Raven then caused personnel in the Emergency Services Unit ("ESU"), including Defendants ESU Captain Does 1 and 2, ESU Officer Does 1-18 and ESU Officers Gatto and Valentin, to harass Plaintiff and violate his constitutional rights by repeatedly searching his cell, improperly destroying his property and assaulting him.

32.    The ESU is the tactical team the DOC relies upon during purported emergencies. The ESU has approximately 114 staff members assigned to it and is on call 24

14

hours a day, seven days a week.  The primary tool of the ESU has been the Tactical Search

Operation ("TSO").  During a typical TSO, a team of ESU officers enters a jail purportedly to

assist the facility in maintaining order and retrieving any contraband materials in the possession

of inmates.  ESU's Rapid Response Team is on call to conduct daily jail search operations.  In

such cases, teams made up of a minimum of ten Rapid Response officers, plus one commander,

respond.  When the ESU conducts a TSO of a housing area or a jail facility, it operates

independently of the facility chain of command, and its members are accountable solely to ESU

supervisors.

    B.  First Retaliatory Search of Plaintiff's Cell by ESU

    33.  At approximately 11:30 a.m. on Sunday, November 5, 2006, Plaintiff was

sitting in the dining room in 3-building near his cell, number 3-A-2, at GRVC waiting for lunch.

    34.  Suddenly, an ESU team came in yelling at all 48 inmates in Plaintiff's

housing unit to get against the wall.  One ESU officer called out Plaintiff's name and ordered

him to "step out."  Plaintiff complied.

    35.  An ESU officer told Plaintiff to go to his cell.  Once there, several ESU

officers ordered Plaintiff to strip naked, performed a body cavity search on him and searched his

cell.  Then the ESU officers left.

    36.  This search, upon information and belief, was instigated by Defendants

Captain Spears and Officer Raven as retaliation for Plaintiff's having developed information

concerning smuggling of contraband by other officers, and, therefore, was calculated to harass, maliciously motivated and without penological justification.

       C.     Second Retaliatory Search of Plaintiff's Cell Escalates When ESU Purposefully Destroys Plaintiff's Property and Legal Papers

37.     At approximately 6:30 p.m., that same day, November 5, 2006, an ESU team consisting of Defendant ESU Captain Doe 1 and Defendant ESU Officer Does 1-10 returned to Plaintiff's cell in GRVC. Again, ESU officers called out Plaintiff's name, ordered him to step out, ordered him to strip naked and performed a body cavity search on him. After that, they told Plaintiff to put his clothes on, handcuffed him, and took him away from his cell to the intake area, even though they were, upon information and belief, required by Department regulations to allow him to observe them search his cell.

38.     While Plaintiff was in the intake area, away from his cell, the ESU officers conducted and concluded their search and left the area.

39.     Upon information and belief, Defendants Captain Spears and Correction Officer Raven instigated this search as retaliation for Plaintiff's having developed information concerning the smuggling of contraband by other officers and, therefore, it was calculated to harass, maliciously motivated and without penological justification.

40.     When Plaintiff was returned to his cell after the ESU officers had left, he discovered that they had poured his food out on the floor and trampled it, thrown his legal papers into the toilet and ripped up two of his white t-shirts. Defendants ESU Captain Doe 1 and ESU

Officer Does 1-10 wantonly and maliciously destroyed Plaintiff's property during the search, which actions were calculated to harass, maliciously motivated and without penological justification.

      41.    Upset that he was kept from watching the search and that the ESU team had destroyed his property, Plaintiff asked to speak with Captain Brown, the area supervisor in the officers' station in Plaintiff's housing area. Brown refused to exit the officers' station to observe and record what the ESU team had done to Plaintiff's cell because, she said, she had no supervisory authority over the ESU.

      42.    Plaintiff then asked to speak to the Deputy Warden, but Captain Brown refused to summon him. Because Captain Brown refused to document the condition of Plaintiff's cell and refused to summon her superior officer, Plaintiff concededly started making noise by kicking trays and yelling so that Captain Brown would be forced to summon assistance, which she or another officer did.

      43.    A probe team responded, along with Captains Morales and Bennett. The captains asked Plaintiff what had happened and Plaintiff pointed them to his cell.

      44.    Plaintiff explained to the captains that the ESU team had put his cell in disarray and destroyed his property and that Captain Brown had refused to come out of the officers' station and examine the condition of his cell and to document it. The captains

17

expressed frustration with Captain Brown and told Plaintiff to go to the intake area and speak with Deputy Warden Biardi. Plaintiff followed this instruction.

45.    On reaching the intake area, Plaintiff explained to Deputy Warden Biardi that the ESU team had wantonly destroyed his possessions while improperly conducting a cell search outside his presence. Biardi responded by telling Plaintiff that ESU did not answer to him or his captains.

46.    Deputy Warden Biardi further informed Plaintiff that ESU was scheduled to search Plaintiff's cell yet again at 2 a.m. that same night. Although Plaintiff had kicked trays, which was an action that could subject Plaintiff to a disciplinary infraction and punishment, Deputy Warden Biardi did not write an infraction against him. Instead, he sent Plaintiff from there to his night job as an SPA in the 11-building at GRVC, and the 2 a.m. search did not occur.

47.    On November 5, 2006, Plaintiff's sister called the Inspector General's office at (212) 266-1900 to complain about Plaintiff's mistreatment by employees of the Department and left a message. A man named "Corrica" returned the call at approximately 12:21 p.m. on November 6, 2006 and spoke with her about the reported mistreatment.

48.    On November 15, 2006, Plaintiff filed a grievance concerning the November 5, 2006 search. Hearing no response, on November 27, 2006, Plaintiff sent a letter of appeal to the Programs Administrator of the Inmate Grievance Resolution Program, which

referred to his prior grievance. Again, hearing no response, Plaintiff sent a letter of appeal on

December 4, 2006 to Defendant Warden Squillante.

49.     On January 5, 2007, Plaintiff filed his notice of claim against Defendant

City for the improper November 5, 2006 ESU search resulting in the destruction of his property.

D.     Third Retaliatory Search by ESU Culminates in an Unprovoked Assault of
       Plaintiff by ESU Officers

50.     After working the night shift in the 11-building, Plaintiff returned to his

cell in the 3-building at GRVC at approximately 10 a.m. on Monday, November 6, 2007. Shortly

thereafter, at approximately 11:30 a.m., an ESU team, including Defendant ESU Captain Doe 2

and Defendant ESU Officers Valentin, Gatto and Does 11-18, came to search Plaintiff's cell

again, bringing a handheld video recorder operated by an African-American female, Defendant

ESU Officer Doe 11.

51.     This search, too, upon information and belief, was instigated by

Defendants Captain Spears and Officer Raven as retaliation for Plaintiff's having developed

information concerning smuggling of contraband by other officers, and, therefore, was calculated

to harass, maliciously motivated and without penological justification.

52.     Defendants ESU Captain Doe 2, ESU Officer Does 11-18 and ESU

Officers Gatto and Valentin ordered everyone in Plaintiff's housing unit against the wall and

called for Plaintiff by name. At this time, Plaintiff approached Defendant ESU Captain Doe 2

and said that he understood that ESU had a job to do and that its officers may technically have

had a right to search his cell, but asked that the ESU team do it in a more professional manner, without destroying his property, as had happened the last time. Plaintiff had a First Amendment right to lodge a grievance with a commanding officer concerning the improperly motivated and conducted searches that had previously resulted in the wanton destruction of his property, including his legal papers.

53.    At that point, Defendant ESU Officer Doe 12 began counting out loud down from 10, which meant that Plaintiff was required to put himself against the wall. Having voiced his grievance to Defendant ESU Captain Doe 2, Plaintiff faced the wall, put his hands on his head, and touched his elbows against the wall.

54.    Nonetheless, Defendant ESU Officer Valentin began to beat him. As Plaintiff stood facing the wall with his hands behind his head and his elbows touching the wall, Defendant ESU Officer Valentin punched him in the neck and head area, propelling Plaintiff to the floor where he hit his head. An unknown number of other Defendant ESU Officers also assaulted Plaintiff while he was lying on the floor. While Plaintiff was lying on the floor, Defendant ESU Officer Gatto sprayed a one second burst of oleoresin capsicum spray (OC spray) into his eyes. Unknown Defendant ESU Officers placed handcuffs on Plaintiff and removed him to the intake area. As a result of the beating by ESU officers, Plaintiff suffered extreme pain and sustained severe emotional and physical injuries. The use of force against Plaintiff violated Department Directive 5006R-B, which governs uses of force by DOC personnel against inmates and forbids the use of force against a non-resisting inmate.

55.    Plaintiff's conduct did not constitute a threat or perceived threat to the security of the jail or anyone therein such as to warrant the repeated application of blows and the OC spray. His beating was a grossly disproportionate response to Plaintiff's stating a grievance to Defendant ESU Captain Doe 2 and asking him to ensure that the ESU properly search his cell, and was intended to punish him for having exercised his First Amendment right to state such a grievance and make such a request and as further retaliation on behalf of Defendant Captain Spears and Officer Raven. Defendants Spears, Raven, Valentin, Gatto, and other ESU Officer Does acted sadistically and maliciously and demonstrated deliberate indifference toward Plaintiff's rights and physical well-being. Defendant ESU Captain Doe 2 and ESU Officer Doe 11 and other Does were present and stood by while Defendants ESU Officers Valentin and Gatto, and other Defendants assaulted Plaintiff in their presence and took no steps to prevent injury to Plaintiff.

56.    On November 15, 2006, Plaintiff filed a grievance concerning the November 6, 2006 assault. Hearing no response, on November 27, 2006, Plaintiff sent a letter of appeal to the Programs Administrator of the Inmate Grievance Resolution Program, which referred to his prior grievance. Again, hearing no response, Plaintiff sent a letter of appeal on December 4, 2006 to Defendant Warden Squillante.

57.    On January 5, 2007, Plaintiff filed his notice of claim against Defendant City for the November 6, 2006 assault by ESU officers.

21

**III.    Corrections Officers Instigate an Inmate Attack on Plaintiff**

A.    Correction Officers Persuade an Inmate to Gather Group of Inmates
Together to Attack Plaintiff

58.    Upon information and belief, on November 7, 2006, Defendant Correction

Officer Does 1 and 2 approached an inmate in GRVC, "Inmate 4," and asked him to gather other

inmates together to assault Plaintiff because, they said, Plaintiff had developed incriminating

information against several officers concerning smuggling cigarettes and drugs into the jail.

Upon information and belief, Inmate 4 did as he was instructed and gathered a number of other

inmates to assault Plaintiff according to the plan formulated by Defendant Correction Officer

Does 1 and 2.

B.    Correction Officers Who Are Aware of Impending Attack on Plaintiff Fail
to Respond to Protect Him

59.    That evening, Correction Officer Bolling and Defendant Captain Nelson

went to Plaintiff's cell in the 3-building at GRVC, where he was sleeping, woke him, asked him

whether he was going to go to work and then told him he had legal mail waiting for him in the

mail room.  Plaintiff was sleeping at that time because he previously had worked the night shift

as an SPA in the 11-building.

60.    Plaintiff got dressed and went to the officers' station, where Defendant

Captain Nelson told him that he was informed by his staff that some inmates wanted to attack

Plaintiff.  Defendant Officer Lynch acknowledged that this was true and said she had been told

by another officer not to open the door to Plaintiff's cell unless a Captain was present.

22

61.    Even though they knew that there was a high probability Plaintiff would be attacked, upon information and belief, Defendants Captain Nelson and Officer Lynch failed to take reasonable steps to protect him.  Instead, they sent Plaintiff to the mailroom alone while they remained in the officers' station.  When Plaintiff went to the mailroom, however, it was approximately 6:30 in the evening and he found it closed.  Upon returning to his housing area alone, Plaintiff was attacked and assaulted by a number of inmates, including Inmate 4.

62.    Despite knowledge of a probable impending attack on Plaintiff, these Defendants removed Plaintiff from his cell and sent him alone to a closed mailroom, which facilitated the attack by inmates.  The attack caused Plaintiff to suffer extreme pain and sustain severe emotional and physical injuries, including a broken fourth metacarpal of the left hand.

C.    Defendants Captain Nelson and Officer Lynch Promise Inmates Who Attacked Plaintiff that They Will Not Be Punished for the Attack and Those Inmates Are Not Punished

63.    Correction Officer Bolling issued a report and notice of infraction against Plaintiff and Hector Stephenson and Reginald Benston, two of the inmates involved in the attack on Plaintiff.  Upon information and belief, Defendants Captain Nelson and Officer Lynch promised Stephenson and Benston that their infractions would not result in punishment, and, upon information and belief, those two inmates were not punished for their attack on Plaintiff. Plaintiff, however, was sentenced to 110 days of punitive segregation, which Plaintiff served in its entirety.

64.     Defendant John Does 1 and 2 acted sadistically and maliciously and demonstrated deliberate indifference to Plaintiff's rights and physical well-being by encouraging and instigating the inmate attack on Plaintiff.

65.     Defendants Captain Nelson and Correction Officer Lynch demonstrated deliberate indifference to Plaintiff's rights and physical well-being by failing to take reasonable steps to protect Plaintiff when they knew he was going to be attacked by inmates, which was a direct and proximate cause of Plaintiff's injuries.

D.     Department Is Warned that Plaintiff Is Being Harassed and Assaulted

66.     On November 7, 2006, Plaintiff's sister called GRVC at (718) 546-2107 at approximately 6:48 p.m. and spoke with someone about Plaintiff's mistreatment. Plaintiff's sister called back again the next morning, November 8, 2006, at approximately 9:36 a.m., and spoke with an Officer Miles about Plaintiff's mistreatment.

67.     On November 10, 2006, Plaintiff's attorneys wrote Defendant Commissioner Horn, Defendant Warden Squillante and Corporation Counsel of Defendant City a letter informing them of the incident involving a guard-facilitated attack on Plaintiff by inmates and asking that certain evidence be preserved. The letter further informed them that there had been previous instances of misconduct by uniformed members of the Department against Plaintiff, and contained the urgent request that they "take immediate measures to protect [Plaintiff] from further reprisals by [other inmates] and prison guards."

24

68.    On November 16, 2006, Plaintiff filed a grievance concerning the November 7, 2006 inmate attack.  Having heard no response, on November 27, 2006, Plaintiff sent a letter of appeal to the Programs Administrator of the Inmate Grievance Resolution Program, which referred to his prior grievance.  Having heard no response, on December 4, 2006, Plaintiff sent a letter of appeal to the Warden of GRVC.

69.    On January 5, 2007, Plaintiff filed his notice of claim against Defendant City for the November 7, 2006 inmate attack on Plaintiff.

## IV.    Defendant Captain Caban and Officers Anthony and Rivera Viciously Assault Plaintiff as He Waits to Consult by Video Conference With his Attorneys

### A.    Defendants Captain Caban and Officers Anthony and Rivera Assault Plaintiff While He Is Alone in a Cell Suffering From a Broken Hand

70.    On the morning of November 14, 2006, Plaintiff was transported from GRVC to the James A. Thomas Center ("JATC") to attend a video conference with his attorneys concerning the violations of Plaintiff's civil rights and other wrongs committed against him in the previous ten days.

71.    At the time, Plaintiff's left hand was immobilized in a plaster cast from his forearm, up to and just past his fingertips, treatment that was rendered for the broken fourth metacarpal of his left hand that he sustained in the November 7, 2006 inmate attack on him. Because of the broken bone in his left hand, related tissue swelling on his palm, and the immobilizing cast, Plaintiff was unable to move his left hand, use the fingers on his left hand or make a fist.  His left arm was also in a sling.

25

72.     At the time, Plaintiff was serving his sentence of punitive segregation,

which meant he had to be kept segregated from general population inmates.  Accordingly, when

he arrived at JATC, Plaintiff was placed alone in a cell.  Thereafter, Plaintiff disagreed with

Defendant Officers Anthony and Rivera concerning whether they were going to move Plaintiff to

a different cell, which Plaintiff opposed, since other cells were either under construction or

contained other inmates.  Defendant Officer Rivera told Defendant Captain Caban that Plaintiff

refused to move out of his cell.

73.     Pursuant to Directive 5006R-B, an inmate's refusal to leave a cell is an

"anticipated use of force," which triggers several specific requirements before using force against

that inmate, including, but not limited to, attempting alternatives to force, summoning a mental

health counselor and obtaining a video camera to record any force used from that point forward.

Defendants followed none of these procedures.

74.     Instead, Defendant Captain Caban immediately became upset and hostile

at Plaintiff's purported refusal to leave his cell and ordered Defendant Officer Rivera to open the

cell.  Defendant Captain Caban then entered Plaintiff's cell, where Plaintiff was alone, and

started jabbing Plaintiff in the chin with his fingers and yelling that when one of his officers

gives Plaintiff an order, Plaintiff will follow it without question.  Then Defendant Captain Caban

started punching Plaintiff on the left side of his face and head with his right fist.  Defendant

Captain Caban continued repeatedly to punch Plaintiff in and around his face and head.  Plaintiff,

unable to use his broken left hand, was severely limited in his ability to defend himself.

26

75.     Defendant Captain Caban's assault on Plaintiff further violated provisions of Directive 5006R-B that force may not be used to punish an inmate and that "[u]nless unavoidable, blows should be directed away from the head."

76.     As Defendant Captain Caban attacked Plaintiff, Defendant Officers Anthony and Rivera joined in.  Officer Hamilton, Plaintiff's escort officer, began yelling at them to stop striking Plaintiff.

77.     After the assault had continued for some time with Plaintiff lying on the floor being struck repeatedly, Defendant Officer Anthony held Plaintiff's hands behind his back, and Defendant Captain Caban placed plastic hand restraints on Plaintiff, with the restraint on his left hand placed around his cast.  The probe team arrived shortly thereafter and took Plaintiff to North Infirmary Command where he was photographed by another correction officer and treated by medical personnel.

78.     Defendant Captain Caban struck Plaintiff on the face and head with his right fist so many times and with such great force that Defendant Captain Caban suffered a serious injury to the knuckles on his right hand.  Indeed, Defendant Captain Caban tore multiple ligaments in his right hand.  Doctors informed him that his knuckles had shifted and that his hand required surgery.  He underwent surgery on his hand on March 7, 2007, after which his hand was in a hard cast for approximately one month and a soft cast for approximately three weeks.  Defendant Captain Caban has indicated he may need additional surgery on that hand.

79.    Plaintiff sustained injuries including, but not limited to, a massive left orbital hematoma with possible left orbital fracture, possible left globe rupture, visible deformity obscuring Plaintiff's temporal bone formation, multiple contusions of the head at the temporal and occipital regions, acute loss of consciousness for thirty seconds to a minute, asymmetrical shape of his head, left eye swollen shut and visible deformities to his ribs. As a result of the assault by Defendants Captain Caban and Officers Anthony and Rivera, Plaintiff suffered severe pain and extensive and serious emotional and physical injuries.

80.    Plaintiff's conduct did not constitute a threat or perceived threat to the security of the jail or anyone therein such as to warrant the repeated application of blows to the head by Defendant Captain Caban and other force applied by Defendant Officers Rivera and Anthony. These Defendants acted sadistically and maliciously and demonstrated deliberate indifference toward Plaintiff's rights and physical well-being. Defendant Officers Anthony and Rivera stood by as Defendant Captain Caban assaulted Plaintiff in their presence and took no steps to prevent injury to Plaintiff, demonstrating deliberate indifference toward Plaintiff's rights and physical well-being.

B.    Defendant Captain Caban and Officers Anthony and Rivera Make False Statements and File False Reports to Conceal Their Unprovoked Assault of Plaintiff and Improper Use of Force

81.    After the assault, Defendant Officer Anthony filed a Report and Notice of Infraction against Plaintiff, which contained false statements and material omissions, upon information and belief, calculated to make it appear as if the three uniformed Department

employees had properly used force against Plaintiff after he allegedly started "throwing punches" at Defendant Captain Caban. For the same reason, Defendants Captain Caban and Officers Anthony and Rivera submitted false use of force reports to Captain Virginia Tello, who was tasked with investigating the infraction and use of force.

82.     Even if Defendants' false accusation – that Plaintiff started "throwing punches" at Defendant Captain Caban first – was true, the force applied by the Defendants was unreasonable and excessive under the circumstances.

83.     Although a disciplinary hearing was initiated against Plaintiff based upon Defendant Officer Anthony's notice and report of infraction, that hearing was suspended before its conclusion, and Plaintiff was never found guilty of an infraction or subjected to internal prison discipline for this incident.

C.     Officials in Charge of Investigating the Use of Force Against Plaintiff and Assessing Whether Defendant Captain Caban and Defendant Officers Anthony and Rivera Properly Used Force Against Plaintiff Did Not Conduct a Proper Investigation, but Instead Sought to Absolve the Officers, Their Supervisors, and the City of Liability

1.     Captain Tello Conducted an Improper Investigation

84.     Captain Tello purportedly investigated the November 14, 2006 incident between Plaintiff and Defendants Captain Caban and Officers Anthony and Rivera. As a captain tasked with investigating a use of force, Captain Tello was required to conduct an investigation that conformed to Department Directive 5006R-B and independently and in an unbiased manner determine whether Defendants' use of force against Plaintiff was appropriate.

29

85.    Section V.E.4. of Directive 5006R-B states:

> Inmate Statements – Statements should be obtained from inmate participants and witnesses by a supervisor designated by the Tour Commander, not involved in or witness to, or present at the incident, as soon as possible after the incident. If no supervisor is available, an officer who did not participate in, or witness the use of force may obtain statements from witnesses.

86.    Nonetheless, on November 14, 2006, Captain Tello violated this provision by (1) refusing to obtain the witness statement of inmate Ramon Rotestan, who, in sworn statements rendered on November 17, 2006 and September 14, 2007, testified that Plaintiff had not assaulted Defendant Captain Caban, but rather Caban had assaulted Plaintiff, this despite Rotestan's oral request to an officer or captain in JATC on November 14, 2006 to give such a statement; and (2) allowing one of the Defendants who was the subject of her investigation to obtain purported witness statements from other inmates that were unfavorable to Plaintiff.  This Defendant, Officer Anthony, signed his name on those statements as the lone witness to their purported creation.

> 2.    Captain Tello Reaches Immediate Conclusion that the Department Was Not Liable for Defendants' Use of Force Against Plaintiff

87.    On November 16, 2006, even though she had not yet completed her investigation or report, Captain Tello sent Defendant Warden Hourihane a memorandum concerning the November 14, 2006 incident in which she stated, "[t]his investigator concludes that DOC and medical staff acted appropriately [i]n their notifications and handling of this incident.  The Department of Correction is not responsible for this matter."

30

88.    Upon information and belief, Captain Tello's "investigation" was not intended independently to verify whether the Defendants' use of force was proper, but rather to create a plausible paper trail to conceal their improper use of force and to avoid their being held responsible for violating Plaintiff's rights.

3.    Captain Tello Ignores Evidence Showing that Defendant Captain Caban and Defendant Officers Anthony and Rivera Used Improper Force, and Instead Asks Those Defendants to Supplement Their Reports With Statements Contradicting that Evidence

89.    When Captain Tello was presented with medical evidence that Plaintiff had suffered an acute loss of consciousness, which was contained in the DOC's injury to inmate report, written on November 14, 2006 by a medical professional who treated Plaintiff, rather than independently assess whether Defendants' use of force against Plaintiff was appropriate, Captain Tello asked the three Defendants in question to submit addenda to their use of force reports containing conflicting accounts stating they saw Plaintiff conscious at all times.  The three Defendants did so, Caban and Anthony on November 17 and Rivera on November 20.  In her official report, dated November 17, 2006, Captain Tello relied on Defendants' self-serving statements concerning Plaintiff's condition, and credited those statements over the written opinion of the medical professional who treated Plaintiff.

4.    Defendant Assistant Deputy Warden Murdoch and Defendant Warden Hourihane Rubber-Stamp Captain Tello's "Investigation" Report In Order to Protect the Department and Its Personnel

90.    On November 17, 2006, Captain Tello forwarded her investigation report containing her conclusion that force was justified and that Plaintiff should be arrested and

31

prosecuted for assault along with supporting documents, including, upon information and belief, the improperly obtained witness statements, up the chain of command to Defendant John Murdoch, Assistant Deputy Warden. Defendant Murdoch was supposed to independently verify Captain Tello's conclusions. Even though he should have known that the inmate witness statements were of dubious origin because they had been obtained by one of the Defendants under investigation, since that officer had signed his name as a witness to statements he had obtained, Defendant Murdoch rubber-stamped Captain Tello's report and conclusion.

91.    Defendant Murdoch passed the report up the chain of command to Defendant Warden Hourihane with his recommendation that Plaintiff be infracted and arrested for his actions. Defendant Warden Hourihane, like Defendant Murdoch, had the facially improper inmate witness statements, upon information and belief, yet he also rubber-stamped Tello's report and conclusion and sent the report up the chain of command on December 5, 2006 to Defendant Squillante, then Assistant Chief of Special Operations.

92.    Some time after the recommendation by high level officials that Plaintiff be arrested for assault on the Defendants, on May 14, 2007, Plaintiff was arrested and charged with criminal assault. That case is pending in New York Supreme Court, Bronx County, with a trial against Plaintiff currently set for December 6, 2007.

93.    Defendants Murdoch and Hourihane acted to cover up the violation of Plaintiff's rights by Defendants Caban, Anthony and Rivera. These Defendants did not independently assess whether or not the use of force complied with Directive 5006R-B

32

(governing uses of force against inmates), which it did not, but rather, upon information and belief, were content to rely on an improper investigation to absolve DOC employees from allegations that they had used improper force against an inmate in violation of Directive 5006R-B.

94.     Plaintiff was injured by this sham investigation because Defendants Murdoch and Hourihane recommended he be arrested and prosecuted for assault, which he has been.  Furthermore, because Defendants Caban and Anthony were not disciplined, but rather emboldened by the report, they retaliated against Plaintiff after he filed a grievance and a notice of claim with the City, seeking redress for the violation of his rights, as alleged herein.

D.     Plaintiff Notifies Defendant Commissioner Horn and the DOC of
       Improper Conduct by Its Personnel and Requests Protective Measures

95.     On November 16, 2006, Plaintiff's attorneys sent a letter to Defendants Commissioner Horn, the Warden of GRVC, the City's legal counsel and the DOC's legal counsel asking that evidence be preserved and repeating their November 10, 2006 request that immediate measures be taken to protect Plaintiff.

96.     After Plaintiff's attorneys sent their November 16, 2006 letter, Plaintiff was transferred from GRVC to the OBCC-CPSU.  On November 22, 2006, Plaintiff's attorneys sent the DOC's legal counsel a letter asking that Plaintiff be transferred to a safer facility.

97.     Around that same time, Plaintiff was transferred out of the custody of the Department to NCCC.

33

98.     On January 3, 2007, Plaintiff was inexplicably transferred back to a facility on Rikers Island from NCCC.

99.     On January 4, 2007, Plaintiff's attorneys sent the DOC's legal counsel a letter requesting he be incarcerated somewhere other than Rikers Island in light of the allegations of repeated instances of abuse by guards there.

100.    On January 5, 2007, Plaintiff filed a notice of claim with the City concerning the November 14, 2006 assault.

101.    On January 31, 2007, Plaintiff's counsel sent the DOC's legal counsel another letter requesting that he be transferred off of Rikers Island for his protection.

102.    On February 2, 2007, Plaintiff's attorneys sent the DOC's legal counsel another letter asking that Plaintiff be protected from abuse by prison guards.

103.    On February 6, 2007, Plaintiff's attorneys sent the DOC's legal counsel another letter asking again that he be transferred off of Rikers Island.

104.    On February 14, 2007, Plaintiff's attorneys again sent a letter requesting that DOC transfer Plaintiff out of the facility where he was being housed.

E.     Defendants Captain Caban and Officer Anthony Retaliate Against Plaintiff
       for Exercising His First Amendment Right to Pursue Remedies for
       Defendants' Assault

105.   On or about February 13, 2007, while Plaintiff was at the judicial center on

Rikers Island, he encountered Defendants Officer Anthony and Captain Caban.  Defendant

Officer Anthony called out to Captain Caban in words or substance, "[h]ey Cap, there goes that

asshole Hayes who is suing us!"  Defendant Captain Caban followed Plaintiff outside the judicial

center towards the bus in which Plaintiff was going to be transported back to his housing unit and

cursed at Plaintiff, calling him a bastard and mentioning something about Plaintiff's lawyers

suing him.  Defendant Captain Caban then punched Plaintiff in the left arm (which was still in a

sling) and told Plaintiff's escort officer, in words or substance, "[p]ut that dickhead on the bus."

As a result of Defendant Captain Caban's actions, Plaintiff feared for his safety.

106.   Defendants Captain Caban and Officer Anthony acted sadistically and

maliciously and demonstrated deliberate indifference toward Plaintiff's rights and physical well-

being.  Furthermore, Defendant Officer Anthony harassed and Defendant Captain Caban

assaulted Plaintiff to intimidate him and in retaliation for Plaintiff's exercising of his First

Amendment right to seek redress for their prior violation of his rights by filing grievances and a

notice of claim, both of which, upon information and belief, these Defendants were aware of.

107.   On February 14, 2007, Plaintiff filed a grievance concerning this incident.

On February 26, 2007, Keith Guerrant, the grievance coordinator at OBCC-CPSU forwarded

Plaintiff's grievance to Defendant Michael Hourihane, then Warden of OBCC.

35

108.    Also on February 26, 2007, Plaintiff's attorneys mailed a letter to Defendant Commissioner Horn, the Warden of GRVC and DOC's legal counsel describing Captain Caban's retaliatory assault and requesting again that Plaintiff be transferred and protected.

109.    On March 28, 2007, Plaintiff filed a notice of claim with the City concerning this incident.

F.    Correction Officers Pay an Inmate to Throw Urine and Feces on Plaintiff to Retaliate Against Him for Exercising His First Amendment Right to Seek Redress of Violations of His Rights

110.    On Sunday, February 25, 2007, at OBCC-CPSU, Defendant Officers Davis and Rodriguez approached an inmate and informed him that they had a problem with Plaintiff because he had filed complaints against their fellow correction officers. Defendant Officers Davis and Rodriguez offered this inmate a pack of cigarettes and extra food if he would throw urine and feces on Plaintiff. The inmate agreed, on assurances that the officers would not charge him with an infraction.

111.    Later that day, Defendant Officers Davis and Rodriguez approached Plaintiff at 5-Southwest 24-cell in OBCC-CPSU to escort him to the shower. As Plaintiff reached the stairs to the next level, near the inmate's cell, the Defendants stepped back, away from Plaintiff, and the inmate threw urine and feces on him.

112.    Defendant Officers Davis and Rodriguez mocked Plaintiff and warned him he had better not grieve the incident. The officers kept their promise not to infract the inmate who had thrown the urine and feces, and paid him with two individual cigarettes (despite having promised an entire pack) and an extra tray of food.

113.    Defendant Officers Davis and Rodriguez acted sadistically and maliciously and demonstrated deliberate indifference toward Plaintiff's rights and physical well-being. Furthermore, Defendant Officers Davis and Rodriguez instigated this assault on Plaintiff to intimidate him and in retaliation for Plaintiff's exercising of his First Amendment right to seek redress for the prior violation of his rights, which, upon information and belief, these Defendants were aware of.

114.    On February 25, 2007, Plaintiff filed a grievance concerning this incident.

115.    On March 7, 2007, Plaintiff's attorneys sent the DOC's legal department a letter describing the incident, asking that certain video footage of the incident be preserved, and asking again that Plaintiff be transferred out of Rikers Island.

116.    On March 28, 2007, Plaintiff filed a notice of claim with the City concerning this incident.

G.    Defendant Correction Officer Jane Doe Punches Plaintiff in Face in
      Retaliation for Exercising His First Amendment Right to Seek Redress of
      Violations of His Rights

117.    On March 15, 2007, between 11 a.m. and 1 p.m., a female correction

officer, Defendant Officer Jane Doe, punched Plaintiff in the face in front of the entrance to the

5-Southwest housing area at OBCC-CPSU.  Defendant Jane Doe told Plaintiff that she did it in

retaliation for him having filed grievances against correction officers.  She then told Plaintiff in

words or substance, "[s]hut the fuck up and step inside" the housing area.

118.    Plaintiff was caused severe pain in his jaw and sustained serious physical

and emotional injury as a result of Defendant Jane Doe's unprovoked attack.  Upon information

and belief, this incident was captured on a videotape subsequently reviewed by an investigator

working for the Inspector General.

119.    Plaintiff's conduct did not constitute a threat or perceived threat to the

security of the jail or anyone therein such as to warrant being punched in the face.  His beating

was wholly unjustified and was intended by Defendant Officer Jane Doe to punish him for

having exercised his First Amendment right to petition for redress of the violation of is civil

rights by other correction officers.  Defendant Officer Jane Doe acted sadistically and maliciously

and demonstrated deliberate indifference toward Plaintiff's rights and physical well-being.

Defendant Jane Doe's use of force against Plaintiff violated Department Directive 5006R-B.

120.    On March 17, 2007, Plaintiff filed a grievance concerning the incident.

121.    On March 19, 2007, Plaintiff's attorneys sent a letter to Defendant Commissioner Horn and the DOC's legal department concerning this incident, requesting that the Department preserve video footage of the incident, and asking again that Plaintiff be transferred to a different facility for his safety.

122.    On March 28, 2007, Plaintiff filed a notice of claim with the City concerning this incident.

H.    Defendant Officer Chapman Retaliates Against Plaintiff by Refusing to Notarize Documents Relating to Plaintiff's Civil Rights Claims and Filing a False Infraction Against Plaintiff to Keep Him Out of the Law Library

123.    On Saturday May 5, 2007, Plaintiff was in the law library conducting research concerning his possible civil rights claims and criminal defense.  Defendant Officer Chapman falsely accused Plaintiff of engaging in lewd conduct while Plaintiff was in the law library.  Another officer present, Officer Obando, told Defendant Officer Chapman that he did not see Plaintiff do that and that she, Defendant Officer Chapman, was not being truthful.

124.    Nonetheless, three days later, Defendant Officer Chapman filed an infraction against Plaintiff for the alleged conduct, which contained false statements and material misrepresentations calculated, upon information and belief, to interfere with Plaintiff's right to use the law library and to petition for the redress of the violation of his civil rights.  Plaintiff was not convicted of any disciplinary violation associated with Defendant Officer Chapman's infraction.

125.    Prior to the May 5 incident, Defendant Officer Chapman engaged in a pattern and practice of attempting to thwart Plaintiff's right to pursue grievance claims. On multiple occasions, Defendant Officer Chapman refused to notarize Plaintiff's documents relating to grievances against fellow officers. On some occasions, she pretended not to know Plaintiff's identity and refused to notarize on that basis. On others, rather than simply verifying Plaintiff's signature, Defendant Officer Chapman read the contents of Plaintiff's grievance-related documents and refused to notarize them because of their content. Defendant Officer Chapman was aware of Plaintiff's grievances and acted as a gatekeeper seeking to prevent Plaintiff from being able to vindicate his rights against DOC employees.

126.    Defendant Officer Chapman's actions were intended as retaliation to punish him for having exercised his First Amendment right to petition for redress of the violation of is civil rights by other correction officers.

## AS AND FOR A FIRST CLAIM FOR RELIEF
(42 U.S.C. § 1983/Eighth and Fourteenth Amendment)

(Against Defendants Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and Murdoch; Captains Caban, Nelson and Spears; Officers Anthony, Chapman Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, and Jane Doe; ESU Captain Does 1 and 2; ESU Officer Does 1-18 and ESU Officers Gatto and Valentin)

127.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 126 as though they were fully set forth here.

128.    By reason of the allegations contained herein, Defendants Captains Caban, Nelson and Spears, Officers Anthony, Chapman, Davis, Lynch, Raven, Rivera, Rodriguez, John

40

Does 1 and 2, and Jane Doe, ESU Captain Does 1 and 2, ESU Officer Does 1-18 and ESU

Officers Gatto and Valentin deprived Plaintiff of his right to be free from gratuitous and

excessive force and punishment, and to due process of law, as guaranteed to him by the Eighth

and Fourteenth Amendments to the United States Constitution. These Defendants' conduct

manifested deliberate indifference to Plaintiff's constitutional rights and subjected Plaintiff to

serious harm.

129.    Defendants Horn, Carolyn Thomas, William Thomas, Shaw, Squillante,

Hourihane and Murdoch exhibited deliberate indifference to the rights of Plaintiff by failing to

act on information indicating that unconstitutional acts were occurring, and failed adequately to

train, supervise, and discipline their subordinate employees, thereby subjecting Plaintiff to

serious harm, and thus acted in their individual capacities to violate Plaintiff's due process rights

under the Eighth and Fourteenth Amendment of the United States Constitution.

130.    As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages alleged herein.

### AS AND FOR A SECOND CLAIM FOR RELIEF
(42 U.S.C. § 1983/First Amendment)

(Against Defendants Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and
Murdoch; Captain Caban; ESU Captain Doe 2; Officers Anthony, Chapman, Davis, Rodriguez
and Jane Doe; ESU Officers 11-18 and Gatto and Valentin)

131.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1

through 130 as though they were fully set forth herein.

41

132.    By reason of the foregoing, and by retaliating against Plaintiff for pursuing all available remedies to protect his civil rights, Defendants Captain Caban, ESU Captain Doe 2, Officers Anthony, Chapman, Davis, Rodriguez and Jane Doe, ESU Officers 11-18 and Gatto and Valentin deprived Plaintiff of his rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the First Amendment to the United States Constitution to free exercise of speech and to petition for the redress of civil rights violations.

133.    Defendants Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and Murdoch exhibited deliberate indifference to the rights of Plaintiff by failing to act on information indicating that unconstitutional acts were occurring, and failed adequately to train and supervise their subordinate employees, and thus acted in their individual capacities to violate Plaintiff's rights under the First Amendment of the United States Constitution.

134.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages alleged herein.

### AS AND FOR A THIRD CLAIM FOR RELIEF
(42 U.S.C. § 1983)

(Against Defendant City of New York and Defendants Commissioner Horn, Chief Carolyn Thomas, Assistant Chief of Special Operations Squillante, Wardens William Thomas, Shaw, Squillante and Hourihane and Assistant Deputy Warden Murdoch, in their official capacities)

135.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 134 as though they were fully set forth herein.

42

Failure to Act

136.    From early November 2006 onward, Defendants the City, the
Commissioner, the Chief, the Assistant Chief of Special Operations, the Wardens of GRVC,
OBCC and CJB and the Assistant Deputy Warden were made aware and knew, from repeated
communications from Plaintiff, his sister and his attorneys, that DOC employees were engaged in
a persistent pattern of harassment and assault in violation of Plaintiff's rights, and furthermore,
upon information and belief, aware, from inmate complaints and lawsuits, of a history of similar
conduct directed at other inmates in DOC-operated facilities.

137.    Defendants knew, upon information and belief, to a moral certainty that,
absent affirmative and decisive actions, either by intervening to protect Plaintiff by removing him
from the situation or by disciplining DOC employees for the violation of Plaintiff's rights, that
such conduct by DOC employees would continue.  Accordingly, the Defendants had a duty to
take steps to end that pattern of abuse.  Nonetheless, they did not.

138.    Instead, these Defendants made a deliberate choice to keep Plaintiff in that
situation and not to discipline the DOC employees who violated Plaintiff's constitutional rights.
Indeed, shortly after the November 14, 2006 incident alleged herein, the Department's
Investigation Division undertook an investigation, and Plaintiff was transferred to NCCC.
Shortly thereafter, Plaintiff was transferred back to Rikers Island, even though the Department
had not yet concluded its investigation, and Defendants denied all of Plaintiff's repeated urgent

requests to be retransferred away from the harassment and assaults. As of August 9, 2007, the Department's legal department informed Plaintiff that this investigation was still ongoing.

139.    Defendants' deliberate choice to keep Plaintiff at Rikers Island and not to discipline the DOC employees who had violated his rights was so likely to result in further violations of Plaintiff's rights that it amounted to deliberate indifference of his rights, tacit approval of the pattern of unconstitutional actions of DOC employees, and a policy, all of which caused Plaintiff to sustain further, foreseeable injuries at the hands of DOC employees in retaliation against him and were a moving force behind those violations.

140.    This failure and policy caused the officers in this case to violate Plaintiff's civil and constitutional rights, without fear of reprisal.

<u>Failure to Train</u>

141.    Defendants the City, the Commissioner, the Chief, the Assistant Chief of Special Operations, the Wardens of GRVC, OBCC and CJB and the Assistant Deputy Warden also caused Plaintiff to sustain serious injuries from the violation of his constitutional rights by DOC employees through their failure adequately to train those employees.

142.    On June 20, 2006, less than five months before the assaults on Plaintiff began, the Department, by Defendants Commissioner and Chief, implemented a revised directive governing the use of force against prisoners, Directive 5006R-B. This directive, in part, was designed to protect the rights of prisoners, including Plaintiff.

143.    By reasons of the allegations in this Complaint, these Defendants were aware of a pattern of uses of force inconsistent with this revised directive and that there was an obvious need to act to protect Plaintiff and other inmates from further violations of their constitutional rights.  Nonetheless, Defendants acquiesced in that pattern rather than undertake efforts to train its employees how properly to use force consistent with the revised directive and prisoners' rights.  Under these circumstances, the Defendants' failure to train DOC employees amounted to a policy of deliberate indifference and caused the officers in this case to violate Plaintiff's civil and constitutional rights.

144.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages alleged herein.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
(Assault)

(Against Defendants Captains Caban, Spears and Nelson; Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, Jane Doe; ESU Captain Doe 2 and ESU Officers Does 11-18, Gatto and Valentin; Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and Murdoch, in their official capacities; and City of New York)

145.    Plaintiff incorporates by reference the allegations set out in paragraphs 1 through 144 as though they were fully set forth here.

146.    Defendants Captains Caban, Spears and Nelson, Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, Jane Doe, and ESU Captain Doe 2 and ESU Officers Does 11-18, Gatto and Valentin intentionally placed Plaintiff in fear of imminent

harmful or offensive contact, and thus deprived him of his right under the laws of the State of New York to be free from the tort of assault.

147.    All these Defendants named herein committed assaults on Plaintiff while acting within the scope of their employment, and thus caused Defendants Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and Murdoch, in their official capacities, and Defendant City of New York to deprive Plaintiff of his right under the laws of the State of New York to be free from the tort of assault.

148.    Within 90 days of the events giving rise to these claims, Plaintiff filed written notices of claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filings of those notices, and these matters have not been settled or otherwise disposed of.

149.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages alleged herein.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
(Battery)

(Against Defendants Captains Caban, Spears and Nelson; Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, Jane Doe; ESU Captain Doe 2 and ESU Officers Does 11-18, Gatto and Valentin; Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and Murdoch, in their official capacities; and City of New York)

150.    Plaintiff incorporates by reference the allegations set out in paragraphs 1 through 149 as though they were fully set forth here.

46

151.    Defendants Captains Caban, Nelson, Spears, Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, and ESU Captain Doe 2 and ESU Officers Does 11-18 and Gatto and Valentin used unreasonable and unnecessary force to cause harmful or offensive bodily contact with Plaintiff, and acted with the intent to contact Plaintiff, and thus deprived him of his right under the laws of the State of New York to be free from the tort of battery.

152.    All these Defendants named herein committed batteries on Plaintiff while acting within the scope of their employment, and thus caused Defendants Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane, and Murdoch in their official capacities, and Defendant City of New York to deprive Plaintiff of his right under the laws of the State of New York to be free from the tort of battery.

153.    Within 90 days of the events giving rise to these claims, Plaintiff filed written notices of claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filings of those notices, and these matters have not been settled or otherwise disposed of.

154.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

155.    Awarding Plaintiff compensatory damages against each and every Defendant, including the City, in an amount of not less than $100,000, jointly and severally, for the physical and psychological injuries and property damage caused by Defendants' violations of his federal constitutional rights.

156.    Awarding Plaintiff punitive damages against each and every Defendant, except the City, in an amount of not less than $250,000 for the physical and psychological injuries and property damage caused by Defendants' violations of his federal constitutional rights.

157.    Awarding Plaintiff compensatory damages against Defendants Captains Caban, Spears and Nelson; Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, Jane Doe; ESU Captain Doe 2 and ESU Officers Does 11-18, Gatto and Valentin; Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and Murdoch, in their official capacities; and City of New York, in an amount of not less than $100,000, jointly and severally, for the physical and psychological injuries and property damage caused by Defendants' violations of Plaintiff's rights under the laws of the State of New York to be free from the tort of assault.

48

158.    Awarding Plaintiff punitive damages in an amount not less than $250,000 against Defendants Captains Caban, Spears and Nelson; Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, Jane Doe; ESU Captain Doe 2 and ESU Officers Does 11-18, Gatto and Valentin, for the physical and psychological injuries caused by Defendants' violations of Plaintiff's rights under the laws of the State of New York to be free from the tort of assault

159.    Awarding Plaintiff compensatory damages against Defendants Captains Caban, Spears and Nelson; Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, Jane Doe; ESU Captain Doe 2 and ESU Officers Does 11-18, Gatto and Valentin; Horn, Carolyn Thomas, William Thomas, Shaw, Squillante, Hourihane and Murdoch, in their official capacities; and City of New York, in an amount of not less than $100,000, jointly and severally, for the physical and psychological injuries and property damage caused by Defendants' violations of Plaintiff's rights under the laws of the State of New York to be free from the tort of battery.

160.    Awarding Plaintiff punitive damages in an amount not less than $250,000 against Defendants Captains Caban, Spears and Nelson; Officers Anthony, Davis, Lynch, Raven, Rivera, Rodriguez, John Does 1 and 2, Jane Doe; ESU Captain Doe 2 and ESU Officers Does 11-18, Gatto and Valentin, for the physical and psychological injuries caused by Defendants' violations of Plaintiff's rights under the laws of the State of New York to be free from the tort of battery.

49

161.    An order awarding Plaintiff the costs of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988(b); and

162.    Such other further relief as the Court may deem appropriate.

Dated:  November 5, 2007
        New York, New York

HUGHES HUBBARD & REED LLP

By:  _____

Lisa A. Cahill
Jason A. Masimore
John T. McGoey
Nkasi Okafor
Allison L. Bowles
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Plaintiff Leroy Hayes*

60036076_1.DOC

50